2002-NMSC-007

42 P.3d 1207

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Frederico GAITAN, Defendant–Petitioner.**

No. 26,743.

Supreme Court of New Mexico.

Feb. 22, 2002.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

BACA, Justice.

{1} Defendant, Frederico Gaitan, was convicted of second degree murder as an accessory under NMSA 1978, § 30–2–1(B) (1994) and NMSA 1978, § 30–1–13 (1972), aggravated assault with a deadly weapon under NMSA 1978, § 30–3–2(A) (1963), tampering with evidence as an accessory under NMSA 1978, § 30–22–5 (1963) and Section 30–1–13, and aggravated battery with a deadly weapon under NMSA 1978, § 30–3–5(C) (1969). Defendant appeals his convictions and raises two issues on appeal: (1) whether the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter; and (2) whether the trial court erroneously admitted evidence of a prior bad act. The Court of Appeals affirmed Defendant's convictions, and we granted his petition for writ of certiorari to the Court of Appeals. *State v. Gaitan*, 2001–NMCA–004, ¶ 28, 130 N.M. 103, 18 P.3d 1056. We affirm.

### I.

{2} On October 13, 1997, Defendant, Richard Padilla, and Viento Herrera initiated an altercation with Stephen and Wesley Zotigh that resulted in Stephen's death. On that night, Defendant, Padilla, and Herrera had been drinking at a party and were driving to another party when they approached the victim and his cousin, who were walking home from a convenience store. During the ensuing altercation, the victim was stabbed four times. He later died as a result of two of the wounds.

{3} According to Wesley Zotigh's testimony, the three men pulled up beside him and his cousin and offered them a ride. After they refused the offer, someone in the car asked them if they were Indian, what their names were, and if they had any money. Zotigh stated that he got the feeling something bad was going to happen after the three men began to giggle inside the car, and he urged the victim to leave. As the two walked away, Zotigh heard the engine rev and felt a "little shove" from the victim, pushing him out of the way. When Zotigh turned around he saw the car hit the victim, throwing him onto the hood of the car. The victim then got off the hood, took off his shirt, and approached Defendant, who had gotten out of his car. Zotigh testified that as Defendant and the victim pushed and shoved each other, Defendant turned toward the car and said, "Let's get out the gat," as he gestured to his friends with both hands. Padilla and Herrera then got out of the car, and all three men began fighting with the victim. Zotigh stated that he then heard one of the men say, "Let's go. Let's go," and the three ran back to the car laughing and drove away. At that point Zotigh realized the victim had been seriously injured.

{4} Padilla testified that he heard the Defendant say "Get the gat" at a party the three men attended earlier in the evening. He stated that Defendant used the words to intimidate people at the party when they refused to allow Defendant to leave with some of the beer. Padilla reiterated that the Zotighs did not want a ride from the three men and had in fact refused their offer. He testified that he was the first person to get back into the car after the altercation and that Defendant was the last one back in. He also stated that after they got back in the car the three men laughed about what had taken place.

{5} Teresa Padilla, Richard Padilla's mother, testified that Herrera told her that after the Zotighs started walking away from the car, Defendant was "acting crazy" and kept asking, "Should I run the fuckers over?" Herrera apparently responded "Go for it," and the Defendant hit the victim with his car.

{6} Vincent Archuleta, another friend of Defendant, testified that on the night of the stabbing Defendant came to Archuleta's trailer and asked if he could stay at his house. Defendant told him that "they had got [sic] in a fight and somebody was stabbed, that they had stabbed somebody." Archuleta's girlfriend, Isabel Cortez, was present at Archuleta's trailer that night, and testified that she too heard Defendant say "We stabbed somebody."

{7} The State also presented testimony from Kevin Silva, who was incarcerated in the Taos County Detention Center when Defendant was brought in on these charges. He stated that he had known Defendant since childhood and that they had both been in the Barrios Small Town gang together. Silva testified that when he asked Defendant why he was in jail, Defendant told him "We pulled a cap back on an Indian," and "We had killed an Indian." Defendant further explained that they had stabbed the victim.

{8} Defendant gave a different version of the events of that night. According to his testimony, he pulled up beside the two men in his car, and Herrera, a passenger, asked them if they wanted a ride. Defendant stated he could not recall why he had pulled over, although he admitted that the Zotighs "weren't asking for a ride," but that they had "pulled over and offered them a ride." After the Zotighs refused Herrera's offer and continued walking, Defendant decided he "wanted to mess around with them a little bit," and he slowly drove up behind them, "revved" his engine, and stopped "real close" to the victim. Defendant stated that when he stopped his car, the victim "must of [sic] thought I was going to hit him or something because I was so close to him. He turned around and maybe his instinct was to jump, so he jumped on my car and he got off and took off his shirt." Defendant testified that after the victim jumped off the hood of the car he came towards Defendant in an aggressive manner. Defendant thought the victim was going to attack him, so he got out of his car to apologize and explain that he was just "playing around." However, as soon as Defendant exited his vehicle the victim began pushing Defendant toward the road. Fearing the victim was going to "pound" him, Defendant told the victim, "I have a gat, leave me alone. I have a gat." Soon thereafter, Defendant saw Herrera and Padilla get out of the car and begin fighting with the victim. Contrary to Padilla's testimony, Defendant stated that he was the first to get back in the car, and that after Padilla and Herrera got back in he drove away.

{9} Defendant testified that, as he was driving away, he saw blood on the victim's face and chest, but thought the victim had a bloody nose. Herrera then commented that he had blood on his hands, and Padilla announced that he had stabbed the victim. Defendant also testified that he did not know Padilla had a knife and did not know that the victim had been stabbed until after they drove away.

## II.

{10} The State charged Defendant with first degree murder as an accessory. The indictment named as principals either Herrera or Padilla, or both. At trial, the jury was instructed on second degree murder as a lesser included offense of first degree murder. The trial court refused Defendant's tendered instructions on the lesser included offenses of voluntary and involuntary manslaughter. Defendant argues that the trial court's failure to tender his requested instructions to the jury constituted reversible error because there was a reasonable view of the evidence which could sustain a finding that voluntary manslaughter, or in the alternative, involuntary manslaughter, was the highest degree of homicide committed by Defendant. We review this issue de novo. *See State v. Salazar*, 1997–NMSC–044, ¶ 49, 123 N.M. 778, 945 P.2d 996 ("The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo.").

## A.

[2–4] {11} A defendant is entitled to an instruction on a lesser included offense when there is " 'some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view [is] reasonable.' " *State v. Brown*, 1998–NMSC–037, ¶ 12, 126 N.M. 338, 969 P.2d 313 (quoting *State v. Curley*, 1997–NMCA–038, ¶ 5, 123 N.M. 295, 939 P.2d 1103). "Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30-2-3(A) (1994). The difference between second degree murder and voluntary manslaughter is that voluntary manslaughter requires sufficient provocation. *Compare* UJI 14–220 NMRA 2002 *with* UJI 14–210 NMRA 2002. Thus, Defendant was entitled to an instruction on voluntary manslaughter only if there was some evidence in the record to support his assertion that sufficient provocation existed.

{12} Because Defendant was charged as an accessory, and the principal and accessory may each be convicted for different degrees of an offense depending on their state of mind, we agree with the Court of Appeals' determination that we must consider whether Defendant, rather than Padilla or Herrera, was sufficiently provoked by the victim. *Gaitan*, 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶¶ 14–15; *see State v. Holden*, 85 N.M. 397, 400, 512 P.2d 970, 973 (Ct.App. 1973) ("The fact that [the accessory] was convicted of a different crime than [the principal] is a permissible result under our accessory statute."). Applying this approach, the Court of Appeals determined that Defendant was not entitled to a voluntary manslaughter instruction because "[e]ven under Defendant's version of the incident, there is evidence that Defendant brought on Steven's attack." *Gaitan*, 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 17. In reaching this conclusion the Court relied on the following language from *State v. Manus*, 93 N.M. 95, 100, 597 P.2d 280, 285 (1979), *overruled in part by Sells v. State*, 98 N.M. 786, 788, 653 P.2d 162, 164: "If the defendant intentionally caused the victim to do acts which the defendant could claim provoked him [or her], [the defendant] cannot kill the victim and claim that he [or she] was provoked. In such case, the circumstances show that [the defendant] acted with malice aforethought, and the offense is murder." (Quoted authority omitted.) We agree with the Court of Appeals.

{13} Defendant argues that the Court of Appeals interpreted this language too broadly, and that the proper reading of *Manus* is that "where the assailed person *intentionally* provokes an attack so that he can use that attack as an excuse for killing, he is guilty of murder." We are not persuaded by Defendant's reading of this case. Rather we conclude that the proper interpretation of this language is that the law does not permit one who intentionally instigates an assault on another to then rely on the victim's reasonable response to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to manslaughter. *See State v. Munoz*, 113 N.M. 489, 491–92, 827 P.2d 1303, 1305–06 (Ct.App.1992) ("We recognize that a defendant cannot pose a threat to the victim and then rely on the victim's response as a legal provocation."); *State v. Durante*, 104 N.M. 639, 643, 725 P.2d 839, 843 (Ct.App. 1986) ("Defendant cannot create the provocation which would reduce murder to manslaughter."); *State v. Padilla*, 104 N.M. 446, 448, 722 P.2d 697, 699 (Ct.App.1986) ("As a general rule, however, there also must be evidence of acts of provocation by the victim that do not result from intentional acts of defendant."); *State v. Marquez*, 96 N.M. 746, 749, 634 P.2d 1298, 1301 (Ct.App.1981) ("If there was any provocation, it was not brought about by [the victim] throwing a vase, but by defendant's illegal entry into [her] home."). "Even in the case where the defendant kills in response to a violent blow, ... [the defendant] may not have [the] homicide reduced to voluntary manslaughter if [the defendant] by his [or her] own prior conduct (as by vigorously starting the fracas) was responsible for that violent blow." 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 7.10(b)(1) (1986). In the present case, not only did Defendant intentionally and vigorously start the fracas with an aggravated battery, there

was not even a violent blow by the victim in response. Thus, as the Court of Appeals determined, even assuming Defendant retreated to his car in fear, Defendant's own version of the events presents evidence that Defendant intended to bring on the victim's attack. Defendant testified that he, Padilla, and Herrera approached the Zotighs in Defendant's car and Herrera asked them if they wanted a ride. Defendant explicitly stated that he could not remember why they had chosen to approach the Zotighs that night, and there was no evidence that either of the Zotighs provoked Defendant prior to this incident. After the Zotighs refused their offer, Defendant decided he "wanted to mess around with them a little bit" so he slowly drove up behind them, "revved" his engine, and stopped "real close" to the victim. Defendant also stated that, as a result of his actions, the victim "must of [sic] thought I was going to hit him or something because I was so close to him" and that the victim became very angry. "If one person attacks another who defends himself with no more force than he is privileged by law to use for his own protection, there is no problem of provocation. The assailant is acting without mitigation of any sort and the defender is fully justified or excused." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law*, 89 (3d ed.1982) (footnotes omitted). Because Defendant intentionally instigated the assault on the victim, he cannot now rely on the victim's reasonable response to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to voluntary manslaughter.

{14} Furthermore, there is no reasonable view of the evidence supporting sufficient provocation as the mental state underlying Defendant's role in the killing. " 'Sufficient provocation' can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." UJI 14–222 NMRA 2002. Under Defendant's version of the facts, he had no intent for the victim to be killed. However, Defendant did intentionally threaten the victim and goad him to respond. He testified that he was "trying to just mess around with [the victim], ... put him in some anger and stuff[, and] ... get[ ] him mad or piss[ ] this young man off." Defendant stated that he knew his actions warranted an apology to the victim, and he testified that the victim's anger was understandable, stating, "he was angry about what happened. And I was guilty about what happened also." Defendant stated, "I don't blame him for being angry, either, because I would have been angry myself." Defendant testified that he "never did attack [the victim]. And [the victim] actually never really attacked me. If he would have attacked me, he would have probably left me with my face pretty swoll [sic] up and stuff. And he just basically just shoved me, pushed me, that was it." Defendant said that "[t]he only time I felt threatened was when I thought he was going to beat me up." From this testimony, it is clear that Defendant did not fear anything more than a beating by the victim, that the victim was going to "pound" him and that he may have a swollen face as a result. *See Salazar*, 123 N.M. 778, 945 P.2d 996, 1997–NMSC–044, ¶ 53 (rejecting the defendant's argument that the victim's actions of "veer[ing] her car at him and reaching under the seat as if to retrieve a gun" aroused fear or terror in the defendant because "[o]ther testimony by the [d]efendant precludes the possibility that he acted out of provocation and therefore eliminates any reason to instruct on voluntary manslaughter"). We, therefore, conclude that the anticipated and, in fact, desired response from the victim did not arouse sufficient fear, terror, or other extreme emotion "as would affect [Defendant's] ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." UJI 14–222. Accordingly, the trial court did not err in refusing to instruct the jury on voluntary manslaughter.

## B.

{15} Defendant also claims he was entitled to an involuntary manslaughter instruction because the evidence supported a reasonable view that involuntary manslaughter was the highest degree of homicide to

which Defendant was an accessory. Defendant concedes that the theory argued on appeal is not the theory expressed in the rejected instruction. However, he argues that the instruction alerted the trial court to the possibility that the facts could be construed to support such an instruction and that the instruction was warranted. We do not agree.

{16} The Court of Appeals deemed this issue unpreserved, noting that "Defendant acknowledges that he failed to preserve the alleged error for appeal because he failed to request an involuntary manslaughter instruction at trial." *Gaitan*, 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 18. While it is clear from the record that Defendant requested an instruction on involuntary manslaughter, we are not persuaded that this instruction properly preserved the issue for appeal. Rule 5–608(D) NMRA 2002, governing the preservation of error in jury instructions, states:

> [F]or the preservation of error in the charge, objection to any instruction given must be sufficient to alert the mind of the court to the claimed vice therein, or, in case of failure to instruct on any issue, a *correct* written instruction must be tendered before the jury is instructed.

(Emphasis added.) The purpose of this language is "to allow the court an opportunity to decide a question whose dimensions are not open to conjecture or after-the-fact interpretation." *Gallegos v. State*, 113 N.M. 339, 341, 825 P.2d 1249, 1251 (1992); *see also State v. Hill*, 2001–NMCA–094, ¶ 7, 131 N.M. 195, 34 P.3d 139 (concluding that although the instruction was flawed, defendant's requested instruction on self-defense was preserved because there was evidence in the record that the attorneys and the judge discussed the issue extensively, and that the trial court understood the type of instruction defendant wanted and should have modified it to correctly state the law).

{17} Defendant's requested instruction asked the jury to find involuntary manslaughter if it determined that either Herrera or Padilla, or both, "stabbed Steven Zotigh with a knife." We do not believe that the act described in the instruction can be characterized as anything other than a felonious act, which is outside the statutory definition of involuntary manslaughter. *See* NMSA 1978, § 30–2–3(B) (1994); *Salazar*, 123 N.M. 778, 945 P.2d 996, 1997–NMSC–044, ¶ 57 (finding that the act of " 'Shooting at Manzanares' " described in the requested involuntary manslaughter instruction could not be characterized as anything other than a felonious act and therefore did not fit within the definition of involuntary manslaughter). Thus, based on the requested instruction, there was no way for the trial court to construe the facts to support such an instruction. Furthermore, there is nothing in the record to indicate that Defendant offered any other theory at trial which would have sufficiently alerted the trial court that it needed to modify the instruction to correctly state the law. As this Court stated in *Salazar*, "[i]t is not error for a trial court to refuse instructions which are inaccurate." 123 N.M. 778, 945 P.2d 996, 1997–NMSC–044, ¶ 57. We believe the trial court correctly refused the inaccurate instruction tendered by Defendant. Moreover, even if Defendant had properly preserved this issue for appellate review, we find no reasonable view of the evidence that supports involuntary manslaughter as the highest degree of crime to which Defendant was an accessory.

{18} Defendant was only entitled to an instruction on involuntary manslaughter if there was some reasonable view " 'of the evidence pursuant to which the lesser offense is the highest degree of crime committed.' " *Brown*, 126 N.M. 338, 969 P.2d 313, 1998–NMSC–037, ¶ 12 (quoting *Curley*, 123 N.M. 295, 939 P.2d 1103, 1997–NMCA–038, ¶ 5). "Involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to [a] felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection." Section 30–2–3(B). As discussed above, "[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his [or her] state of mind; it may have been different from the state of mind of the princi-

pal and they thus may be guilty of different offenses." 2 LaFave & Scott, *supra*, § 6.7(c), at 144. We thus consider whether there was some reasonable view of the evidence presented at trial which would have warranted giving the instruction.

{19} In *Holden*, our Court of Appeals considered the issue of accessory liability as it relates to involuntary manslaughter. In that case, the evidence introduced at trial was that the defendant was looking for the victim and had made a statement to the effect that he was going to get someone to beat the victim up. *Holden*, 85 N.M. at 399, 512 P.2d at 972. Shortly after learning of the victim's whereabouts, defendant returned to that location with another man who then shot and killed the victim. *Id.* The Court determined that "[t]he fact that [the defendant] did not bargain for the result [was] not material. The material fact [was] that he did 'procure' another to perform an 'unlawful act.'" *Id.* at 400, 512 P.2d at 973. Thus, the Court concluded that there was "substantial evidence that [the defendant], with the intent to commit an unlawful act, procured [the principal] to inflict a beating on decedent," and death occurred. *Id.* This amounted to the lesser included offense of accessory to involuntary manslaughter. *Id.*

{20} This case is distinguishable from *Holden*. According to Defendant's testimony, he had no intent that Padilla or Herrera act at all during the altercation with the Zotighs. He testified that he thought the victim was going to attack him, so he got out of his car to apologize, and as soon as he exited the vehicle the victim began pushing him toward the road. Defendant told the victim, "I have a gat, leave me alone. I have a gat," fearing the victim was going to "pound" him. Defendant explained that he used the statement to intimidate the victim, not as a call for help from his friends. Defendant also testified that there was never any agreement between the three men to fight the victim, nor did he think that they would "jump in" for him. Thus, Defendant's own testimony does not present a reasonable view of the evidence which would support involuntary manslaughter as the highest degree of homicide to which Defendant was an accessory, because

according to Defendant's theory of the case he did not intend, help, encourage or cause the acts which resulted in the victim's death. *See* UJI 14–2822 NMRA 2002.

{21} Furthermore, under no version of the facts presented at trial is Defendant entitled to the instruction. First, on appeal Defendant argues that a reasonable view of the evidence would have supported the instruction on the theory that Defendant by his negligent actions—provoking the altercation—precipitated the unintentional killing. This argument misinterprets accessory liability as it applies to involuntary manslaughter because it focuses on Defendant's actions as an accessory, rather than on his intent with respect to the actions of the principals. *See* 2 LaFave & Scott, *supra*, § 6.7(c), at 144. However, even if Defendant's conduct of provoking the altercation precipitated the acts which eventually resulted in the victim's death, we do not agree that Defendant's actions were negligent. Defendant acknowledged that as a result of intentionally approaching the victim with his vehicle, the victim "must of [sic] thought I was going to hit him or something because I was so close to him." Even if we assume Defendant did not strike the victim with his vehicle, according to Defendant's own testimony, the victim presumably believed he was going to hit him. Thus, at the very least, Defendant's actions were criminal and amounted to an aggravated assault with a deadly weapon (a motor vehicle), a fourth degree felony. *See* § 30–3–2(A) ("Aggravated assault consists of . . . unlawfully assaulting or striking at another with a deadly weapon. . . ."); *State v. Mata*, 86 N.M. 548, 550, 525 P.2d 908, 910 (Ct.App. 1974). More importantly, nothing about that act demonstrates the appropriate intent: that Defendant intended for Padilla or Herrera, or both, to commit "an unlawful act not amounting to [a] felony," which resulted in the victim's death. Section 30–2–3(B).

{22} Second, even if Defendant only said "I have a gat," intending to intimidate the victim, that statement also constitutes the felony of aggravated assault and again fails to show the intent required for the instruction. *See* § 30–2–3(B); *Mata*, 86 N.M. at 550, 525 P.2d at 910.

{23} Finally, with respect to the stabbing of the victim by the principals, the jury was presented with two alternative statements by Defendant relevant to his intent as an accessory. Under the first alternative, according to his own testimony, Defendant said, "I have a gat," intending to intimidate and not as a call for help. If believed by the jury, this statement would have resulted in an acquittal on the accessory to murder charge, because Defendant would not have shared the principals' purpose or design. Under the second alternative, Defendant said, "Let's get the gat," intending that his friends get a weapon and help him seriously injure or kill the victim. If believed by the jury, this statement demonstrates liability as an accessory to first or second degree murder because Defendant intended that a felonious act be committed. See § 30–2–1.

{24} Defendant has advanced no argument, and we find no reasonable view of the evidence, pursuant to which involuntary manslaughter is the highest degree of crime to which Defendant was an accessory. We will not "fragment the testimony ... to such a degree as to distort it" in order to construct a view of the evidence which would support the giving of the instruction. *Manus*, 93 N.M. at 100, 597 P.2d at 285. Accordingly, the trial court did not err in refusing to instruct the jury on involuntary manslaughter.

### III.

{25} Defendant also asserts that the trial court improperly admitted testimony that Defendant said "Get the gat," at a party several hours before the stabbing incident. He argues that the statement was irrelevant, unfairly prejudicial, and constituted inadmissible propensity evidence. The trial court admitted the statement, concluding that it was relevant to the issues in the case, was not unfairly prejudicial, and could be construed as an admission by a party opponent. We will only reverse the trial court's ruling regarding the admissibility of evidence if the court abused its discretion. *See State v. Garcia*, 99 N.M. 771, 776, 664 P.2d 969, 974 (1983); *State v. Hamilton*, 2000–NMCA–063, ¶ 14, 129 N.M. 321, 6 P.3d 1043, *cert. denied*, 129 N.M. 207, 4 P.3d 35 (2000) *and cert. denied*, 129 N.M. 249, 4 P.3d 1240 (2000).

{26} Under Rule 11–404(B) NMRA 2002, "[e]vidence of other crimes, wrongs, or acts" is not admissible to show that the defendant had a propensity to commit the charged crimes. However, this evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Rule 11–404(B). "In order to admit evidence under [this Rule], the court must find that the evidence is relevant to a disputed issue other than the defendant's character, and it must determine that the prejudicial effect of the evidence does not outweigh its probative value...." *State v. Beachum*, 96 N.M. 566, 567–68, 632 P.2d 1204, 1205–06 (Ct.App.1981); *see also Hamilton*, 129 N.M. 321, 6 P.3d 1043, 2000–NMCA–063, ¶ 14.

{27} Defendant argues that the State's proffered reasons for using Defendant's statement were "nothing more than propensity recast in other words." He asserts that the State sought to admit the statement to show that Defendant was a "bullying gang member" and had a "propensity to commit violent acts with guns." The State responds that the statement was probative of the disputed issue of whether Defendant was an accessory to several crimes including murder and assault with intent to commit a violent felony. We note that to convict the Defendant of these crimes as an accessory the State was required to prove that Defendant intended that the crimes be committed and that he helped, encouraged, or caused the crimes to be committed. *See* UJI 14–2822. The State asserts that the evidence of the earlier statement made at the party is useful as a comparison to his similar statement made during the altercation with the Zotighs, in that, "it tended to show that when in trouble the [D]efendant used a phrase that alerted his friends to the fact that he wanted them to help him as necessary." We agree with the Court of Appeals that the statement was admissible under Rule 11–404(B) "because the trial court could have concluded that the statement was highly probative of

Defendant's intent to enlist or encourage the help of his companions and therefore relevant to the disputed issue of Defendant's liability as an accessory." *Gaitan,* 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 24 (relying on *State v. Carrasco,* 1997–NMSC–047, ¶ 7, 124 N.M. 64, 946 P.2d 1075, which stated that the criminal intent of the accessory "can be inferred from behavior which encourages the act").

{28} Furthermore, Defendant argues that the trial court misapplied the law by failing to perform the proper balancing test under Rule 11–403 NMRA 2002 and consequently erred in concluding that its prejudicial impact did not substantially outweigh its probative value. We disagree. Rule 11–403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

In this case, the trial court specifically indicated its concern that the statement was prejudicial, explaining that "this is really a question of ... weighing and balancing." Thus, as the Court of Appeals determined, based on the record, it appears that the trial court conducted the proper Rule 11–403 analysis. *See Gaitan,* 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 26.

{29} We further agree with the Court of Appeals that the prejudice of the statement did not outweigh its probative value to show Defendant's intent. At the time the statement was admitted, "the State had already introduced testimony concerning Defendant's gang affiliation, 'bullying' nature, and propensity for violence." *Gaitan,* 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 27 (relying on *State v. Woodward,* 121 N.M. 1, 6, 908 P.2d 231, 236 (1995), which stated that "[t]he purpose of [Rule] 11–403 is not to guard against the danger of any prejudice whatever, but only against the danger of *unfair* prejudice. A statement is not unfairly prejudicial simply because it inculpates the defendant."). Testimony had been elicited that Defendant was "acting crazy" and kept asking, "Should I run the fuckers over," which was corroborated by Defendant's own admissions of his desires to "mess around with them a little bit." Two witnesses testified that Defendant hit the victim with his car, and Zotigh testified that during the altercation Defendant said, "Let's get out the gat." Furthermore, both Archuleta and his girlfriend, Cortez, stated that on the night of the stabbing Defendant admitted that they had stabbed somebody, and Silva testified that Defendant told him that they had "killed an Indian." We agree with the Court of Appeals that "[b]alancing this evidence with the probative value of the statement to show Defendant's intent, the trial court did not abuse its discretion in admitting· [the] testimony." *Gaitan,* 130 N.M. 103, 18 P.3d 1056, 2001–NMCA–004, ¶ 27.

## IV.

{30} For the foregoing reasons we affirm Defendant's convictions for second degree murder as an accessory, aggravated assault with a deadly weapon, tampering with evidence as an accessory, and aggravated battery with a deadly weapon.

{31} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice and PETRA JIMENEZ MAES, Justice.

GENE E. FRANCHINI and PAMELA B. MINZNER, Justices (concurring in part, dissenting in part).

MINZNER, Justice (concurring in part and dissenting in part).

{32} I respectfully dissent. I believe Defendant was entitled to an instruction on voluntary manslaughter. I agree that the trial court did not abuse its discretion in admitting the "get the gat" statement. I also agree that Defendant's proposed instruction on accessory to involuntary manslaughter was flawed and that he thus failed to preserve an appellate issue with respect to an instruction on that theory. Because on remand Defendant might draft a better instruction and put on new or different evidence, I would not reach the issue of his

entitlement to an instruction on involuntary manslaughter. I therefore concur in part II(B) to the extent that it holds that issue was not preserved, and I concur in part III. For the following reasons, I dissent from part II(A), and I would remand for a new trial.

{33} Defendant sought an instruction on voluntary manslaughter. Defendant was not the killer, but the State charged him as an accessory. Manslaughter consists of "the unlawful killing of a human being without malice," NMSA 1978, § 30-2-3 (1994), and voluntary manslaughter is "manslaughter committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30-2-3(A) (1994). Defendant is liable for voluntary manslaughter as an accessory if he "procures, counsels, aids or abets in its commission." NMSA 1978, § 30-1-13 (1972). In order to be entitled to an instruction of a lesser included offense to the offense charged, there must be some reasonable view of the evidence whereby the lesser offense is the highest degree of the offense committed. *State v. Brown*, 1998-NMSC-037, ¶ 12, 126 N.M. 338, 969 P.2d 313. Thus, to be entitled to the instruction, there must be some reasonable view of the evidence whereby Defendant was sufficiently provoked by the victim, and while so provoked Defendant aided, abetted or encouraged Padilla and Herrera to kill the victim.

{34} The State has argued that Defendant was not entitled to the voluntary manslaughter instruction as an accessory for two reasons. First, Defendant was not sufficiently provoked by the victim's size and anger. Second, Defendant was the initial aggressor and as such cannot rely on the victim's response as adequate provocation.

{35} The first question is properly one for the jury. As the majority notes, Defendant testified that he revved his engine to scare the victim, and when the victim responded by taking off his shirt and jumping on the hood of the car, he got out to apologize. Although he was not initially afraid of the victim—despite the significant difference in their sizes—Defendant testified that he did feel threatened when he thought the victim was going to "pound" him. Majority Opinion, ¶ 8.

I believe there is thus a view of the evidence in which Defendant was provoked. The jury should have been given the opportunity to decide whether to credit Defendant's testimony and to determine whether the provocation was sufficient under the law. The trial court ought not have decided, as a matter of law, that Defendant was not provoked. *State v. Munoz*, 113 N.M. 489, 490, 827 P.2d 1303, 1304 (Ct.App.1992) ("Whether a particular set of circumstances is sufficient provocation is generally a question for the jury to decide.").

{36} The State's second argument appears to me to expand a rule past its original boundaries and to create a per se rule where a fact-based one is appropriate. In *State v. Manus*, 93 N.M. 95, 100, 597 P.2d 280, 285 (1979) we said: "If the defendant intentionally caused the victim to do acts which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such case, the circumstances show that he acted with malice aforethought, and the offense is murder." Based on that language the majority concludes that, as a matter of law, Defendant is not entitled to an voluntary manslaughter instruction because he initially assaulted the victim.

{37} The first sentence of this quote can be read in more than one way, depending on the interpretation given to the word "intentionally." As the State argues, intentionally could be read to describe the act that causes the victim to respond. Thus, a negligent act that elicits a response from the victim is distinguished from an intentional act. On the other hand, as Defendant argues, intentionally could be read to describe the motive in doing the act that elicits the victim's response. In that way, a defendant who provokes a victim *in order to* rely on the victim's response as provocation is distinguished from one who intends to agitate the victim, but is surprised by that victim's reaction and genuinely provoked by it. The former, by virtue of the premeditated decision to kill, is guilty of murder, and the latter, who lacks such premeditation and is actually provoked by the victim, is guilty of manslaughter.

{38} I think the latter interpretation is more natural, and is confirmed by the second

sentence of the quoted language: "In such case, the circumstances show that he acted with malice aforethought, and the offense is murder." By this language the author of *Manus* indicated that the reason for the rule that a initial aggressor cannot claim provocation is because the circumstances of that initial aggression evince an intent to murder prior to the provocation. Additionally, the author of *Manus* quoted this language from *Wharton's Criminal Law.* That source followed the quote used in *Manus* with an example: "Thus, a defendant is guilty of murder when he arms himself and plans to insult the victim and then kill him if the victim strikes him in resentment over the insult." 2 Charles E. Torcia, *Wharton's Criminal Law* § 157, at 352 (15th ed.1994) (footnote omitted). That example seems to me to clarify the rule and to support a conclusion that an initial aggressor loses the benefit of provocation in more limited circumstances than urged by the State.

{39} Such an interpretation is brought out by the facts of *Manus* and subsequent cases that rely on this rule. Although *Manus* was the source of the rule quoted above, the defendant in that case was largely denied the instruction because the acts he claimed provoked him were performed by the police in the lawful exercise of their duty. "The exercise of a legal right, no matter how offensive, is no such provocation as lowers the grade of homicide." *Manus*, 93 N.M. at 100, 597 P.2d at 285 (citation omitted).

{40} In *State v. Marquez*, 96 N.M. 746, 634 P.2d 1298 (Ct.App.1981), for example, the defendant, who had a bad history with the victim, went to her home, broke in, took a knife from the kitchen and waited for her to come home. When she did, he confronted her and got into an argument during which he stabbed a chair in the room repeatedly with the knife. He then chased the victim and managed to stab her once. She responded by throwing a vase at him, which he claimed provoked him. He then killed her. In that case, unlike this one, there is simply no view of the evidence that allows an inference that the defendant killed in response to the victim's provocation.

{41} Similarly, in *State v. Durante*, 104 N.M. 639, 725 P.2d 839 (Ct.App.1986), the defendant broke into the victims' house wearing a ski mask, put his hand over the sleeping female victim's mouth and instructed her to be quiet or he would kill her. The male victim, who was sleeping next to her, woke up, observed what the defendant was doing, and struggled with him. During the struggle, the defendant stabbed the male victim several times. The male victim was responding to a serious threat to his safety from a masked and armed intruder, a threat realized by the intruder's actions.

{42} This interpretation is endorsed by the commentators. In addition to the view expressed in *Wharton's Criminal Law,* another commentator has described the rule of provocation in the context of a mutual quarrel or combat:

> If an unlawful attack is resisted by force obviously in excess of what is needed in self-defense, the case may or may not be within the rule of provocation. There is no mitigation in favor of the original assailant if he intended in the beginning to kill or to inflict great bodily injury; whereas if the original assailant intended only a nondeadly scuffle the counter attack may constitute adequate provocation.

Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 89 (3d ed.1982) (footnotes omitted). Whether the victim's response was in excess of self-defense, whether Defendant intended to kill prior to the encounter, or whether he was surprised by the victim's response are all fact-intensive inquiries that should properly be considered by a jury. A per se rule that, as an initial aggressor, Defendant was not entitled to claim provocation seems to deprive Defendant of his right to have a jury determine whether he was sufficiently provoked in this context.

{43} In this case there is a version of the facts, from Defendant's testimony and some permissible inferences from his conduct, that he did not provoke the victim with the predetermined intent of killing him, and that when he encouraged his companions to come after the victim he was afraid of him. The evidence of provocation was not overwhelming, and a jury could easily determine that Defendant's testimony concerning his intentions was untrustworthy, and that his actions support an inference that he intended to kill from the beginning of the encounter. That

was, however, the jury's decision to make, and the jury was deprived of that opportunity when the trial court denied the proper instruction. I do not consider this error harmless because "[t]here is a legitimate concern that conviction of the greater offense may result because acquittal is an alternative that is unacceptable to the jury." *State v. Meadors*, 121 N.M. 38, 52, 908 P.2d 731, 745 (1995) (Ransom, J., specially concurring).

{44} Defendant's original intent in approaching the victim and the sufficiency of the provocation are both questions for the jury. Having put forth some evidence of provocation as a part of his theory of the case, Defendant was entitled to an instruction. I respectfully dissent from part II(A), and I would remand this case for a new trial. I concur in the holding in part II(B) that Defendant failed to preserve his claim to an instruction on involuntary manslaughter, and I concur in part III.

I CONCUR: GENE E. FRANCHINI, Justice.