This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

**v.**                                                                NO.  31,527

**ANTHONY GRACEN GUTIERREZ**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**James A. Hall, District Judge**

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**DANIELS, Justice.**

This is a direct appeal from Defendant Anthony Gracen Gutierrez's convictions

for first-degree murder and conspiracy to commit murder in connection with a revenge spree in which a Santa Fe home was invaded and one man was fatally shot in the head, another was shot in the head but survived, a third escaped a fatal shot to the head when a pistol jammed, and another intended victim was not located at the scene of the shootings. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA. A jury found Defendant guilty of first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and conspiracy to commit murder, contrary to NMSA 1978, Section 30-28-2 (1979). He was sentenced to life imprisonment for the murder conviction and nine years plus an eight-year habitual offender enhancement for the conspiracy conviction, for a total of seventeen years to be served concurrently with the life sentence.

Defendant argues (1) that the evidence against him was insufficient to sustain his convictions, (2) that the district court abused its discretion under Rule 11-403 NMRA by admitting testimony that he had been on probation and testimony relating to the circumstances under which he told his probation officer that he had been arrested on suspicion of murder but had gotten away with it, and (3) that he received ineffective assistance of counsel.

We find no reversible error. Because the arguments raise no novel questions

of law that are not addressed sufficiently in New Mexico precedents, we issue this unpublished decision affirming Defendant's convictions pursuant to Rule 12-405(B) NMRA.

## I.     FACTUAL BACKGROUND

On, Friday, June 15, 2007, Defendant and his friends Jacob Chavez and Michael Martinez attended a party at a hotel in Santa Fe, where Defendant and Chavez got involved in a fight. A witness described Defendant's participation, saying he actively "backed up" Chavez in their fight against others, becoming scratched and bruised in the process. After the fight, Defendant and Chavez left the hotel in Chavez's blue Tahoe truck, and Defendant was dropped off at his home. Chavez and Martinez went on to another party at Max Valdez's house, the ultimate scene of the fatal confrontation, later in the evening.

At Max Valdez's party, Jacob Chavez asked a guest, Erik Garcia, where he was from and became angry and confrontational when Garcia said he was from El Paso, Texas. As the argument intensified, Chavez produced a pistol, cocked it, and brandished it while yelling at Garcia, who took off his shirt to show he was unarmed. Michael Martinez also produced a pistol and backed up Chavez. Valdez pleaded with the men not to "do that here" in his home, but the confrontation continued. In response to Valdez's plea, Chavez said, "Come on. I just want to shoot him." More

people became involved in trying to defuse the situation. Garcia was able to slip out the back door of Max Valdez's house during the confusion. Chavez and Martinez searched outside for him, both with guns drawn, but when those efforts were unsuccessful, they left Valdez's house.

After Erik Garcia got away from them, Jacob Chavez and Michael Martinez met with Defendant at a park near Chavez's house. All three men then returned to Chavez's house, Defendant again riding in Chavez's blue Tahoe. At Chavez's house, all three appeared to Defendant's girlfriend to be anxious to go back to Max Valdez's house. Defendant asked his girlfriend for a ride back to Max Valdez's house. Defendant himself said to her they were "going back to take care of business." She believed "they were up to something" and tried to dissuade them from going back, telling them "it wasn't worth it." She refused to drive for them and instead left Chavez's house alone, returning to the same Santa Fe hotel where the first party took place.

At around 5 or 6 a.m., Jacob Chavez and Michael Martinez broke through the front door of Max Valdez's house, rushing into the living room with pistols in their hands. Chavez was in the lead, while Martinez came in after him. As Chavez entered the house, he shot Kyle Clark at close range, the bullet striking Clark in the mouth and exiting from the side of his head. Chavez then aimed his pistol at another guest's head

and pulled the trigger, but the gun jammed and did not fire. As Chavez pointed his pistol at other people in the living room, Martinez yelled "No, no. It's not them. It's not them." Most of the occupants fled as Chavez and Martinez continued to move through the house with their pistols drawn. Chavez and Martinez then entered Valdez's room, and another shot rang out. Valdez was later found dead in his bedroom, with the cause of death determined to be a gunshot wound to the face from a range of less than two to three feet.

Two witnesses who fled the Valdez house testified that they saw a blue Tahoe parked outside with its engine running and a person sitting behind the wheel. One of those witnesses identified Defendant as the person sitting in the driver's seat.

Defendant's girlfriend testified that Defendant and Michael Martinez returned together to the Santa Fe hotel where she was staying early Saturday morning and continued drinking. Defendant's girlfriend said that Defendant was visibly nervous at the hotel, looking out the window and insisting that the blinds be closed. Defendant told her he did not intend to leave the hotel. He gave her money to go to a Santa Fe mall, where she bought clothes for the two of them. Another witness who saw Defendant on Sunday, the day after the killing, said that he was noticeably uneasy, was sweating, and became markedly nervous when a police car passed by.

When interviewed by police, Defendant made a number of false denials about

his activities and whereabouts around the time of the killings. He claimed he spent the entire night of the killing by himself at the Santa Fe hotel where the first party had occurred. At one point, he said he went with his girlfriend to visit a friend named "Jerry" that weekend but was unable to provide Jerry's last name or address. Defendant falsely denied seeing Jacob Chavez and Michael Martinez at all that weekend, other than briefly on Saturday afternoon, and claimed the abrasions on his body came from falling down the stairs.

Defendant was arrested in this case on July 13, 2007, but his charges were dismissed after his girlfriend refused to testify before the grand jury. Some months later, on February 5, 2008, Defendant met with his probation officer on an unrelated charge, and he tested positive for cocaine use. When confronted with the test results, Defendant said to the probation officer, "I was arrested for murder and I got away with it. I am not going to mess with this." After this revelation and upon his girlfriend's willingness to cooperate with the authorities, Defendant was rearrested and this prosecution ensued.

## II. DISCUSSION

### A. The Evidence Against Defendant Was Sufficient to Support His Convictions for First-Degree Murder and Conspiracy to Commit Murder.

Defendant challenges the sufficiency of the evidence to support his convictions

for first-degree murder and conspiracy to commit murder. In reviewing a claim of insufficiency of the evidence, we determine whether "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We "must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). The role of the appellate court is to scrutinize the evidence and supervise "the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Baca*, 1997-NMSC-059, ¶ 13, 124 N.M. 333, 950 P.2d 776 (internal quotation marks and citation omitted).

Although Defendant makes separate sufficiency arguments against each of the two charges, essentially the same evidentiary review is applicable to both his conviction for first-degree murder on an aiding and abetting theory and his conviction for conspiracy to commit first-degree murder. We will therefore review the essential elements which must be proven for each charge and then review the evidence that equally supports both charges.

*Essential Elements of Conspiracy to Commit Murder*

The conspiracy charge brings together two statutes, the general conspiracy statute and the first-degree murder statute. First-degree murder is a felony statutorily defined as "any kind of willful, deliberate and premeditated killing." NMSA 1978, § 30-2-1(A)(1) (1994). The separate crime of conspiracy is defined as "knowingly combining with another for the purpose of committing a felony . . . ." NMSA 1978, § 30-28-2(A) (1979).

The gist of conspiracy in New Mexico is a meeting of the minds to commit a felony. *See State v. Deaton*, 74 N.M. 87, 89, 390 P.2d 966, 967 (1964). The conspiracy is complete upon the formulation of a plan, whether or not the felonious act is ever consummated. *See State v. Gilbert*, 98 N.M. 77, 82, 644 P.2d 1066, 1071 (Ct. App. 1982). This meeting of the minds is generally demonstrated by circumstantial evidence and not by direct evidence. *See Deaton*, 74 N.M. at 90, 390 P.2d at 968. The agreement in a conspiracy "is generally a matter of inference deduced from the facts and circumstances, and from the acts of the person accused done in pursuance of an apparent criminal purpose." *Id.* at 90, 390 P.2d at 968. The evidence need not show "that the parties came together and actually agreed upon a method of operation for the accomplishment of the offense. A mutually implied understanding is sufficient." *Id.* at 89-90, 390 P.2d at 967-68. Our uniform jury

8

instructions, unchallenged in this case, reflect the law in New Mexico that to prove a charge of conspiracy to commit first-degree murder, the evidence must show, by words or acts, that an agreement between Defendant and another person to commit first-degree murder had been made and that Defendant and the other person intended to commit first-degree murder.  *See* UJI 14-2810 NMRA.

*Essential Elements of Aiding and Abetting First-Degree Murder*

While a conspiracy is complete upon formation of an agreement to commit a crime, whether or not the substantive crime is ever committed, accessory liability makes a person responsible for actual commission of a substantive criminal offense, no matter what the person's particular role, and a person "may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime . . . ."  NMSA 1978, § 30-1-13 (1972).  "For accomplice liability, the State must show not only [that a defendant was] aiding in the commission of the killing but also that the defendant intended that the underlying felony be committed and 'intended the killing to occur or knew that [he][she] was helping to create a strong probability of death or great bodily harm.'"  *State v. Fry*, 2006-NMSC-001, ¶ 23, 138 N.M. 700, 126 P.3d 516 (second and third alteration in original) (quoting UJI 14-2821 NMRA).  This intent can be inferred from behavior that encourages the act or informs the confederates that

the accessory approves of the crime. *See State v. Ochoa*, 41 N.M. 589, 599, 72 P.2d 609, 615 (1937). The two separate requirements, intent by a defendant that another person commit the offense and an act on the defendant's part to cause the other person to commit it, are based on the general principle of criminal culpability that "the *actus reus* element of a crime is distinct from the *mens rea* element . . . ." *State v. Schoonmaker*, 2008-NMSC-010, ¶ 48, 143 N.M. 373, 176 P.3d 1105 (observing that a conviction for child abuse cannot be sustained in the absence of sufficient evidence of both elements). Thus, for the evidence to be sufficient to support a conviction for aiding and abetting first-degree murder, it must provide a rational basis for a jury to be convinced beyond a reasonable doubt that a murder was committed; that the accused helped, encouraged, or caused it to be committed; and that the accused deliberately intended the murder to take place. *See* UJI 14-2821 NMRA.

With those essential elements of the two conviction offenses in mind, we turn to a consideration of the supporting evidence.

*Sufficiency of the Evidence to Support Convictions for Conspiracy and Aiding and Abetting First-Degree Murder*

There was ample evidence from which a reasonable jury could have concluded that Defendant conspired with Jacob Chavez and Michael Martinez to commit one or more murders and that he aided and abetted in the resulting murder of Max Valdez.

10

The three had been working as a team bent on random violence throughout the course of the evening and night. The State introduced evidence that Defendant and Jacob Chavez had supported each other in the first confrontation at the hotel. Michael Martinez drew a firearm without provocation against a stranger in the second confrontation at the home of Max Valdez. And all three colluded in deciding to go back together to the Valdez home with loaded weapons to "take care of business," after Chavez had threatened to shoot Erik Garcia at the home and after Chavez and Martinez had then unsuccessfully pursued Garcia with guns drawn. This mutual willingness to help each other in their violent attacks supports a rational inference that the three men continued to act with a common purpose later that night. *See State v. Gaitan*, 2002-NMSC-007, ¶ 27, 131 N.M. 758, 42 P.3d 1207 (noting that the defendant's intent to enlist or encourage the help of his companions in violent situations was relevant to his liability as an accessory).

The jury heard testimony that after Erik Garcia eluded Jacob Chavez and Michael Martinez, Defendant met with Chavez and Martinez at a park and then at Chavez's house. The jury heard that Defendant asked his girlfriend for a ride back to Max Valdez's house, demonstrating Defendant's plan to be part of what was to occur there. The jury heard about Defendant's own words that he and the others planned to go back to the Valdez home to "take care of business," even after Defendant's

girlfriend told him that it "wasn't worth it." The evidence that Defendant waited outside the murder scene in the idling getaway car after he could not persuade his girlfriend to handle the driver's duties is proof of both the conspiratorial agreement and the substantive act of aiding and abetting. When Chavez and Martinez, the two gunmen, were in the house and Chavez started shooting at occupants in the living room, Martinez shouted to Chavez that "It's not them! It's not them!" This telling comment indicated that the assailants had come to the Valdez home with two or more planned victims in mind, and from such evidence the jury could conclude that the most likely intended victims were Erik Garcia, whom Chavez and Martinez had pursued with guns drawn before Garcia escaped, and Max Valdez, who had entertained Garcia in his home and who had tried to protect him from harm. And the evidence showed the gunmen were partially successful in their plan to kill "them." Although Chavez and Martinez never found Garcia, they successfully hunted down and killed Valdez in the bedroom of his own home.

Defendant's conduct after the killings also reflected both his membership in the criminal partnership and his own consciousness of guilt. A defendant's conduct after an alleged crime may corroborate his or her participation in the crime. *See State v. Johnson*, 2004-NMSC-029, ¶ 64, 136 N.M. 348, 98 P.3d 998 (noting that it is "a well accepted principle that any conduct on the part of a person accused of a crime

subsequent to its commission, which indicates a consciousness of guilt[,] may be received as a circumstance tending to prove that he [or she] committed the act for which he [or she] is charged" (internal quotation marks and citations omitted)). After the shootings, Defendant and co-conspirator Michael Martinez holed up together at the hotel, where Defendant's conduct reflected apprehension and an attempt to conceal himself from police. He lied to investigators about what he had done, where he had been, and whom he had been with on the night of the murderous rampage. And of at least equal significance, the jury heard about Defendant's own telling admission to his probation officer after Defendant's girlfriend had refused to testify before the grand jury to many of these facts and after his own charges were resultingly dismissed: "I was arrested for murder and I got away with it."

All of these facts come together to create a substantial body of evidence from which a reasonable jury could conclude beyond a reasonable doubt that Defendant conspired with Jacob Chavez and Michael Martinez to go to the home of Max Valdez to kill Erik Garcia and Valdez and possibly unknown others, and that he aided and abetted the shooters by encouraging them to go back to the house, by trying to enlist a getaway driver, and finally by taking on that role for himself, waiting outside the crime scene with the engine running for a quick getaway.

**B.** **The District Court Did Not Abuse Its Discretion Under Rule 11-403 by**

**Admitting Testimony of Defendant's Probation Officer.**

Defendant argues that the testimony of his probation officer, who told the jury the circumstances of Defendant's probation and the circumstances under which Defendant stated that he "got away with [murder]," should not have been admitted. Defendant contends that there was insufficient information to support an inference that the "got away with it" statement referred to this particular case. He also argues that the introduction of the circumstances surrounding the statement, particularly the fact that Defendant was on probation for undisclosed past crimes, was unfairly prejudicial.

A trial court's decision to admit evidence under Rule 11-403 is reviewed for abuse of discretion. *State v. Otto*, 2007-NMSC-012, ¶¶ 9, 14, 141 N.M. 443, 157 P.3d 8. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case[,] . . . clearly untenable[,] or not justified by reason." *Id.* ¶ 9 (internal quotation marks and citation omitted).

The trial judge properly admitted the evidence in question. Under Rule 11-403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." This determination is left to the sound discretion of the trial court judge, who is given considerable leeway in these necessarily fact-sensitive

14

rulings. *Otto*, 2007-NMSC-012, ¶ 14. The purpose of Rule 11-403 is not to exclude all harmful evidence but instead to guard "against the danger of *unfair* prejudice. Evidence is not unfairly prejudicial simply because it inculpates the defendant. Rather prejudice is considered unfair when it goes *only* to character or propensity." *Otto*, 2007-NMSC-012, ¶ 16 (internal quotation marks and citations omitted). A trial judge lawfully has the discretion to admit even extremely harmful evidence where its probative value is very high. *See, e.g., id.* ¶¶ 2-4, 15 (upholding the trial court's decision to admit evidence of the defendant's uncharged sexual acts against a child victim because the evidence was highly probative of absence of mistake or accident).

Evidence is relevant if it makes a fact of consequence more or less probable. *See* Rule 11-401 NMRA. Defendant's statement was a highly relevant "[a]dmission by a party-opponent," Defendant himself in this case. *See* Rule 11-801(D)(2)(a) NMRA. The statement reflects a perception by Defendant that he had been arrested for murder but that he had gotten away with it. There was no information presented to the trial judge that would have indicated Defendant had been arrested and gotten away with more murders than the one in this case. Determining the true meaning of a party's statement is the province of the jury, and it certainly would have been reasonable for the jury to conclude that Defendant meant he got away with the murder at the Valdez house after his charges were dismissed.

Despite the potential prejudicial effect of allowing the jury to hear the circumstances under which Defendant made the challenged statement, the trial court did not abuse its discretion by admitting those circumstances because they increased the relevance of the statement. It is clear that the State intended to offer the facts that Defendant was on probation when he made the statement and that he made the statement to his probation officer as evidence of the veracity of the statement. It is highly unlikely that Defendant would make up a statement to his own probation officer that he had gotten away with murder if there were no factual basis for his confident statement.

It was also important for the jury to know of the probation officer's official responsibilities and relationship to Defendant in order to evaluate the officer's credibility as a reporter of both the statement and the context in which Defendant made it. The evidence Defendant's statement provided was extremely relevant, and the context of its making could not reasonably be ignored or excised. The surrounding facts of Defendant's probation were not admitted to show simply that Defendant was on probation and therefore was a bad person. The context was integrally necessary to the jury's understanding of the significance of Defendant's own words. The judge weighed the possibility that the jury might conclude from the statement that Defendant was a bad person with criminal propensities against the

16

probative value of the statement, and the judge admitted the statement appropriately. This is what is required of the judge under Rule 11-403, and we find no abuse of discretion in his result.

**C.     Defendant Was Not Denied Effective Assistance of Counsel.**

Defendant also claims that he was denied his constitutional right to effective assistance of counsel because his attorney (Counsel) failed to interview his former girlfriend, one of the State's primary witnesses, before trial.

To succeed in a claim of ineffective assistance that rises to a constitutional denial, a defendant must show both a deficiency in representation, such that the attorney's conduct fell below that of a reasonably competent attorney, and that there was resulting prejudice to the adequacy of his defense. *State v. Grogan*, 2007-NMSC-039, ¶¶ 10-11, 142 N.M. 107, 163 P.3d 494. The ineffective assistance of counsel inquiry must be highly deferential to counsel's judgment, avoid the distorting effects of hindsight, and take into account all of the circumstances surrounding the defense. *See Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666. When applying this test, the presumption is that counsel is competent. *State v. Jacobs*, 2000-NMSC-026, ¶ 48, 129 N.M. 448, 10 P.3d 127. An error is not unreasonable if it "can be justified as a trial tactic or strategy." *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. "Prejudice is shown when there

17

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Schoonmaker*, 2008-NMSC-010, ¶ 32 (internal quotation marks and citation omitted).

When Defendant's former girlfriend testified against him in the State's case in chief, she told the jury that Defendant said he was "going back to take care of business." Defendant's girlfriend testified that she told an officer about the statement in an interview. However, it appears from the record that the "take care of business" statement, as a direct statement of the witness, was on no formal transcripts or documentation of interviews with the witness. The record shows that Counsel was caught by surprise at trial by this statement. Defendant now contends that Counsel's failure to interview the witness or to review her statements prior to trial constituted ineffective assistance.

While failure to make adequate pre-trial investigation and preparation may be grounds for finding ineffective assistance of counsel, *State v. Barnett*, 1998-NMCA-105, ¶ 30, 125 N.M. 739, 965 P.2d 323, a defendant must also demonstrate that "there is a reasonable probability that but for counsel's unprofessional error, the result of the proceeding would have been different." *State v. Hernandez*, 115 N.M. 6, 17, 846 P.2d 312, 323 (1993) (internal quotation marks and citation omitted). In conducting the two-part ineffective assistance analysis, this Court

may consider the prejudice prong first if it more effectively disposes of the ineffective assistance claim. *See id.* at 16-17, 846 P.2d at 322-23. Accordingly, we turn now to the prejudicial effect of Counsel's failure to conduct a pre-trial interview of Defendant's prior girlfriend.

Defendant was not significantly prejudiced by Counsel's failure to interview the witness. While Defendant contends that the failure to interview the witness left Counsel unprepared for an immediate impeachment, Counsel nonetheless reviewed the witness's prior interviews after she testified, and later Counsel impeached her testimony. On cross-examination of the interviewing police detective, Counsel demonstrated to the jury that there was no prior recording or documentation of the witness ever having claimed that she heard Defendant or anyone else discuss a desire to return to the Valdez house to "take care of business." While delayed, pointing this fact out constituted an effective impeachment by omission.

Counsel then followed up on his impeachment of the girlfriend's testimony in his closing argument, reminding the jury that the statement was not found in any reports or transcripts and was not heard in any recorded interviews. Counsel also explained his theory of the statement, that its conspicuous absence from the interview transcripts and recordings demonstrated the fact that the witness made it up for the first time at trial. Because of this, Counsel's failure to interview the witness

beforehand would have made little difference in the overall outcome of the trial. Had Counsel more thoroughly prepared for this witness before trial, the only difference at trial would have been an immediate impeachment by omission instead of a delayed one through the investigating officer. Counsel still would have impeached her testimony in the presence of the jury and been able to argue that impeachment's implications in closing, just as he did at trial.

Because Defendant cannot demonstrate prejudice from Counsel's failure to interview the witness before trial, we need not consider whether that failure fell below an objectively reasonable standard of representation. Therefore, we must reject Defendant's ineffective assistance of counsel claim.

**III.    CONCLUSION**

Finding no reversible error, we affirm Defendant's convictions and sentences.

**IT IS SO ORDERED.**

_____

**CHARLES W. DANIELS, Chief Justice**

20

**WE CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**