Date: 11/10/87

_____
(DISTRICT PUBLIC DEFENDER)
(IF NONE, OTHER APPOINTED COUNSEL)

APPROVED OCTOBER 1, 1947; AMENDED OCTOBER 1, 1976          RP0079
FORM: M.026

2001-NMCA-004                          Court of Appeals of New Mexico.

18 P.3d 1056                           Dec. 14, 2000.

STATE of New Mexico,                   Certiorari Granted, No. 26,743,
Plaintiff–Appellee,                    Jan. 29, 2001.

v.

Frederico GAITAN, Defendant–Appellant.

No. 20,493.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Albuquerque, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

WECHSLER, Judge.

{1} A jury convicted Defendant Frederico Gaitan of second degree murder as an accessory, aggravated assault with a deadly weapon, tampering with evidence as an accessory, and aggravated battery with a deadly weapon. Defendant raises two issues on appeal: (1) whether the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter; and (2) whether the trial

court erroneously admitted evidence of a prior bad act. We affirm.

*Facts*

{2} The deceased, Steven Zotigh, was stabbed after an altercation with Defendant and his companions Viento Herrera and Richard Padilla. Defendant and Viento were friends, and Richard was Viento's cousin. Defendant and Richard met for the first time the night of the incident. The three had been drinking at a party and were driving to another party when they approached Steven and his cousin, Wesley Zotigh, walking home from a convenience store.

{3} According to Defendant's testimony, he drove toward the two and stopped his car. Viento asked the Zotighs if they wanted a ride. The Zotighs expressed that they did not want a ride and walked away. Defendant decided he "wanted to mess around with them a little bit after they started walking." He drove up slowly behind them, "revved" up his engine, and then stopped "real close" to Steven. In response, Steven jumped on the hood of the car, took off his shirt, and angrily approached Defendant.

{4} Defendant testified that he feared Steven was going to break his window, so he got out of the car to explain that he was just "playing around." Steven began pushing Defendant toward the road. Fearing that Steven, who was much larger than Defendant, was going to "pound" him, Defendant told him "I have a gat, leave me alone. I have a gat." Both Defendant and the State elicited testimony that "gat" is a slang term for a gun. Viento and Richard then got out of the car and began fighting with Steven. Defendant got back into his car and started the engine. After Viento and Richard returned to the car, Defendant drove away.

{5} Defendant testified that as they drove away, Richard announced that he had stabbed Steven. He also testified that he did not know Richard had a knife and did not know Steven had been stabbed until after

they drove away. Richard's testimony was similar, except he denied having a knife or doing the stabbing. Richard also testified that he and Viento participated in the fight with Steven, that he never witnessed Defendant and Steven fighting, and that Defendant was the last person to get in the car when they left the scene.

{6} Wesley's version of the incident was somewhat different. He testified that after refusing their offer for a ride, someone asked them their names, asked if they were Indian, and then asked them for money. Wesley testified that he had a bad feeling something was going to happen and urged Steven to leave. As they walked away, he heard the engine rev up, and felt a "little push." He moved out of the way, and as he turned around, the car hit Steven, throwing him on the hood of the car. He further testified that after the shoving match between Defendant and Steven, Defendant turned to the car and said, "Let's get out the gat," as he gestured with both hands. Viento and Richard got out of the car and they, together with Defendant, began fighting with Steven. He heard one of the young men say, "Let's go. Let's go," and the three ran back to the car laughing and drove away.

{7} Teresa Padilla, Richard's mother, testified that Viento told her that when they approached the Zotighs in the street, Defendant was acting crazy, and kept saying, "Should I run the fuckers over?" Viento responded, "Go for it," and Defendant hit Steven with his car, angering him.

{8} Steven was stabbed four times and died as a result of two of the wounds. The State charged Defendant with first degree murder as an accessory, conspiracy to commit first degree murder, aggravated assault with a deadly weapon, tampering with evidence as an accessory, and aggravated battery with a deadly weapon. The jury acquitted him of the first degree murder and conspiracy charges, but convicted him of second degree murder as an accessory, tam-

pering with evidence as an accessory, and aggravated assault. Defendant appeals those convictions.

*Jury Instructions*

■ {9} The State charged Defendant with first degree murder as an accessory. The indictment listed the principals, in the alternative, as either Viento or Richard. At trial, the trial court instructed the jury on second degree murder as a lesser included offense of first degree murder. Defendant argues on appeal that he was also entitled to instructions on voluntary and involuntary manslaughter, as lesser included offenses of second degree murder.

■ {10} A defendant is entitled to an instruction on a lesser included offense when (1) evidence exists which "tend[s] to establish the lesser offense," and (2) there is "some view of the evidence which could sustain a finding that the lesser offense was the highest degree of the crime committed." *State v. Fish,* 102 N.M. 775, 779, 701 P.2d 374, 378 (Ct.App.1985).

■ {11} The difference between second degree murder and voluntary manslaughter is that voluntary manslaughter requires sufficient provocation. *See* UJI 14–220 NMRA 2000. Otherwise, the elements for both offenses are the same. *Compare* UJI 14–211 NMRA 2000 (listing elements of second degree murder) *with* UJI 14–220 (listing elements of voluntary manslaughter). "Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30–2–3(A) (1994). The jury instruction defining sufficient provocation, required when instructing on the lesser included offense of voluntary manslaughter, states:

"Sufficient provocation" can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition. The "provocation" is not sufficient if an ordinary person would have cooled off before acting.

UJI 14–222 NMRA 2000.

{12} Defendant was charged as an accessory, which is defined as one who "procures, counsels, aids or abets" in the commission of a crime. *See* NMSA 1978, § 30–1–13 (1972). The State therefore had the burden to prove beyond a reasonable doubt that:

1. The defendant intended that the crime be committed;

2. The crime was committed; [and]

3. The defendant helped, encouraged or caused the crime to be committed.

UJI 14–2822 NMRA 2000.

{13} Thus, the question for our review is whether there is some view of the evidence that supports the proposition that voluntary manslaughter as an accessory was the highest degree of crime committed. *See Fish,* 102 N.M. at 779, 701 P.2d at 378. Defendant argues that to properly evaluate whether there existed sufficient evidence to warrant an instruction on voluntary manslaughter as an accessory, sufficient provocation should be examined from his perspective. The State, however, argues that the evidence must have established that Viento and Richard, as alternative principals, were sufficiently provoked. According to 2 Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 6.7(c) at 143–45 (1986), which discusses the independence of one participant's level of guilt from that of another, sufficient provocation is viewed from a defendant's perspective.

The notion that the accomplice may be convicted, on an accomplice liability theory, only for those crimes as to which he personally has the requisite mental state, is applicable in a variety of circumstances. It means, for example, that one may not be held as an accomplice to the crime of assault with intent to kill if that intent was not shared by the accomplice. But this limitation has proved most significant in the homicide area, where the precise state of mind of the defendant has great significance in determining the degree of the offense. To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; it may have been different from the state of mind of the principal and they thus may be guilty of different offenses. Thus, because first degree murder requires a deliberate and premeditated killing, an accomplice is

not guilty of this degree of murder unless he acted with premeditation and deliberation. And, because a killing in a heat of passion is manslaughter and not murder, an accomplice who aids while in such a state is guilty only of manslaughter even though the killer is himself guilty of murder. Likewise, it is equally possible that the killer is guilty only of manslaughter because of his heat of passion but that the accomplice, aiding in a state of cool blood, is guilty of murder.

*Id.* at 144–45 (footnotes omitted).

■ {14} This approach is consistent with New Mexico case law on accessory liability. To be guilty as an aider and abettor, one must share the criminal intent of the principal and "a community of purpose and partnership in the unlawful undertaking [must] be present." *State v. Ortega,* 77 N.M. 7, 17, 419 P.2d 219, 227 (1966); *see also State v. Riley,* 82 N.M. 298, 299, 480 P.2d 693, 694 (Ct.App.1971) (affirming accessory's conviction for burglary when principal completed the crime of burglary by an unauthorized entry with the necessary intent, and accessory knew, was present and participated by assisting in carrying away of property). However, the principal and accessory may each be convicted for different degrees of an offense depending upon their state of mind. It is permissible, for example, to convict the accessory of involuntary manslaughter and the principal of voluntary manslaughter. *See State v. Holden,* 85 N.M. 397, 400, 512 P.2d 970, 973 (Ct.App.1973) (stating that the accessory statute permitted a principal and an accessory to be found guilty of different crimes).

{15} Applying this approach, we examine whether there was some evidence that Steven sufficiently provoked Defendant. Viewing the evidence in the light most favorable to Defendant, there was evidence that when Defendant approached the Zotighs in his car, Viento offered them a ride. After the Zotighs turned down the offer, Defendant drove up to them, revved up his engine, and then stopped "real close" to Steven. In response, Steven jumped on the hood of the car, took off his shirt, threw it on the ground, and aggressively approached Defendant as if he was going to attack him. Defendant asserts that if the jury believed his version of the incident, it could have found that Defendant experienced the requisite degree of provocation to support an instruction for voluntary manslaughter.

■ {16} Generally, the crime of murder will not be reduced to manslaughter unless the victim provokes the defendant. *See State v. Manus,* 93 N.M. 95, 99, 597 P.2d 280, 284 (1979), *overruled in part by Sells v. State,* 98 N.M. 786, 653 P.2d 162 (1982). Therefore, "[i]f the defendant intentionally caused the victim to do acts which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such case, the circumstances show that he acted with malice aforethought, and the offense is murder." *Manus,* 93 N.M. at 100, 597 P.2d at 285 (internal quotations and citation omitted).

{17} Even under Defendant's version of the incident, there is evidence that Defendant brought on Steven's attack. Defendant testified that after the Zotighs declined their offer for a ride, he decided to "mess around with them," so he revved up his engine, drove toward Steven and "stopped real close to him." It was immediately after this incident that Steven became angry and began pushing Defendant. Defendant also testified that Steven must have thought Defendant was going to hit him because when he drove up close to Steven, Steven became very angry. There is no evidence that either Steven or Wesley provoked Defendant prior to this incident. Consequently, under an accomplice theory, a rational jury could not have convicted Defendant for voluntary manslaughter.

■ {18} To the extent Defendant argues he was entitled to an instruction on involuntary manslaughter, we do not address the issue. Defendant acknowledges that he failed to preserve the alleged error for appeal because he failed to request an involuntary manslaughter instruction at trial. *See State v. Noble,* 90 N.M. 360, 365, 563 P.2d 1153, 1158 (1977) ("Objections to instructions cannot be raised for the first time on appeal where defendant neither objected to the instructions at trial nor tendered any written

request."). We affirm the trial court's refusal to instruct the jury on voluntary and involuntary manslaughter.

*Admission of Evidence*

{19} Defendant contends the trial court improperly admitted Richard's testimony concerning a statement made by Defendant earlier in the evening. Over Defendant's objection, Richard testified that the three were at a party earlier in the evening. When leaving the party, he heard Defendant say, "Get the gat," in an effort to intimidate people at the party into letting them take beer.

{20} Defendant argued below that the statement was irrelevant, prejudicial, and constituted inadmissible prior bad act evidence. *See* Rule 11–404(B) NMRA 2000. The State argued that the statement was an admission by a party opponent and that defense counsel opened the door by asking Richard about the party where they had been drinking beer and then later asking if he ever heard Defendant say, "Get the gat." In addition, the State argued the statement was relevant because it corroborated the reliability of Wesley's testimony that Defendant later used the same words at the scene of the stabbing. The trial court admitted the statement, concluding that it was relevant to the issues in the case and could be construed as an admission by a party opponent. We review the trial court's decision for an abuse of discretion. *See State v. Altgilbers,* 109 N.M. 453, 471, 786 P.2d 680, 698 (Ct.App.1989).

{21} We agree with the trial court that the statement is an admission by a party opponent as the rule broadly defines that term. *See* Rule 11–801(D)(2)(a) NMRA 2000 (defining an admission as a statement offered against a party that is "the party's own statement, in either an individual or a representative capacity").

{22} We also agree with Defendant, however, that Defendant did not open the door to this testimony. Defense counsel questioned Richard as follows:

Q: And while you were in the car, did you ever hear anybody say, "Get the"—

[Prosecutor]: Objection[ ], leading.

[Judge]: Sustained.

. . . .

Q: Do you know what a gat is?

A: Yes, sir.

Q: What is it?

A: It's a gang slang for gun.

Q: Did you ever hear that phrase while you were out there, while [Defendant] was out with this individual?

A: No, sir.

Q: Did you ever hear that phrase while Viento was out there?

A: No, sir.

Defense counsel's question to Richard about the "gat" statement was clearly limited to the time they were in the car at the scene of the stabbing. It was wholly unrelated to the earlier questions about the party.

{23} As to relevance, Defendant asserts that the State sought to admit the statement for no other reason than to show that Defendant was a bullying gang member and had a violent propensity to commit violent acts with guns. In response, the State argues that the statement was probative of the disputed issue of whether Defendant intended and helped or encouraged the crimes committed against Steven. Specifically, it tended to show that when in trouble, Defendant sought the help of his friends.

{24} We conclude that the statement was admissible under Rule 11–404(B), which provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

The statement is admissible because the trial court could have concluded that the statement was highly probative of Defendant's intent to enlist or encourage the help of his companions and therefore relevant to the disputed issue of Defendant's liability as an accessory. *See State v. Carrasco,* 1997–NMSC–047, ¶ 7, 124 N.M. 64, 946 P.2d 1075 (stating that an accessory's intent "can be

inferred from behavior which encourages the act"). Defendant acknowledges that evidence concerning his culpability for murder as an accessory was highly contested at trial, particularly on the issue of his intent to aid in the commission of the stabbing. *See State v. Niewiadowski*, 120 N.M. 361, 364, 901 P.2d 779, 782 (Ct.App.1995) (stating that the defendant's claim of provocation, self-defense, and defense of another placed the issue of his intent squarely at issue).

■ {25} In addition, Defendant contends the trial court merely stated that the evidence was relevant, but never expressly articulated whether the statement was probative on a particular issue, or whether it related to one of the exceptions under Rule 11–404(B). But the trial court need not expressly articulate the reason for admission of evidence, so long as there is probative value to the evidence. *See State v. Jones*, 120 N.M. 185, 188, 899 P.2d 1139, 1142 (Ct. App.1995) (stating that Rule 11–404(B) is a rule of inclusion in New Mexico and the issue "is whether there is a probative use of the evidence that is not based on the proposition that a bad person is more likely to commit a crime"); *State v. Beachum*, 83 N.M. 526, 527, 494 P.2d 188, 189 (Ct.App. 1972) ("A decision of the trial court will be upheld if it is right for any reason."). Rule 11–404(B) does not require the trial court to make specific findings. Furthermore, the trial court could have determined that Defendant's intent was the consequential fact to which the evidence was directed. *See Jones*, 120 N.M. at 187, 899 P.2d at 1141 (explaining persuasive quality of an analysis under Rule 11–404(B) that includes an evaluation of the "consequential facts for which the evidence is offered" and the way in which those facts are proved). We conclude that the statement was relevant to the issue of intent in a way that did not merely show a propensity for violence. *See Niewiadowski*, 120 N.M. at 363–64, 901 P.2d at 781–82.

{26} Moreover, we disagree with Defendant's assertion that the trial court misapplied the law by failing to assess the statement's probative value against its prejudicial effect. During argument by counsel, the tri-

al court specifically indicated its concern about the prejudicial quality of the evidence. The court explained in its ruling that, although the evidence was prejudicial, it was relevant. The court further stated "this is really a question of ... weighing and balancing." Based on the record, it appears that the trial court conducted the proper Rule 11–403 balancing analysis. *See State v. Aragon*, 1999–NMCA–060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (stating that there is a presumption in favor of the correctness of a trial court's rulings).

{27} Finally, we conclude that the probative value of the testimony outweighed any prejudice to Defendant. At the time the State sought to admit the statement, the State had already introduced testimony concerning Defendant's gang affiliation, "bullying" nature, and propensity for violence. *See State v. Woodward*, 121 N.M. 1, 6, 908 P.2d 231, 236 (1995) ("The purpose of [Rule] 11–403 is not to guard against the danger of any prejudice whatever, but only against the danger of *unfair* prejudice. A statement is not unfairly prejudicial simply because it inculpates the defendant."). The jury had heard testimony that Defendant was acting crazy the night of the stabbing, and kept asking, "Should I run the fuckers over?" Two witnesses had already testified that Defendant hit Steven with his car. Wesley testified that after a shoving match with Steven, Defendant turned to the car and said, "Let's get out the gat," as he gestured with both hands. Vincent Archuleta, another friend of Defendant, heard Defendant say on the night of the stabbing that "they had got in a fight and somebody was stabbed, that they had stabbed somebody." Balancing this evidence with the probative value of the statement to show Defendant's intent, the trial court did not abuse its discretion in admitting Richard's testimony. *See id.* at 4, 908 P.2d at 234 (reiterating that a trial court does not abuse its discretion unless its ruling is "clearly untenable or not justified by reason").

*Conclusion*

{28} For all the foregoing reasons, we affirm Defendant's convictions for second degree murder as an accessory, aggravated

assault with a deadly weapon, tampering with evidence as an accessory, and aggravated battery with a deadly weapon.

{29} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, Judge, T. GLENN ELLINGTON, Judge.