This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37979**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**RUBEN ROMERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**Pedro G. Rael, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren Joseph Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**B. ZAMORA, Judge.**

**{1}** Defendant Ruben Romero appeals his conviction for second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994). Defendant raises three arguments on appeal: (1) the State failed to demonstrate that he validly waived his statutory right to remain silent prior to questioning by law enforcement, (2) the district court erred in denying his request to instruct the jury on self-defense and voluntary manslaughter, and (3) the district court abused its discretion by failing to consider the expert testimony presented at Defendant's amenability hearing. We affirm.

**BACKGROUND**

**{2}** In September 2015, Walter Salazar (Victim) asked Defendant and Rudy Valencia, who were both sixteen years old at the time, to assist in removing tree branches from a property he was remodeling. Victim offered Defendant and Valencia twenty dollars to help him remove the branches. They agreed to help, believing that Victim was offering them twenty dollars *each*, but when the work was complete, Victim only paid Defendant and Valencia a *total* of twenty dollars. Valencia and Defendant left without argument but returned later that afternoon and confronted Victim. Victim's cousin, Gilbert Salazar, testified that the second time Valencia and Defendant confronted Victim, they "drove up and [Valencia] was in the bed of the truck [and] . . . jumped out with a shovel[.]"[1] Victim grabbed a rake as Valencia approached. In response, Valencia grabbed a rifle from the bed of the truck and shot Victim. Victim died from the gunshot wound. Later that same evening, police questioned Defendant regarding Victim's death. In a recorded statement, Defendant admitted that he drove Valencia to Victim's house and that Valencia shot Victim.

**{3}** The State charged Defendant as an accessory to murder. A grand jury indicted Defendant on an open count of murder, and the case proceeded to trial. The defense filed a motion to exclude Defendant's recorded statement, arguing that the State did not prove that Defendant knowingly, intelligently, and voluntarily waived his right to remain silent. The court denied the motion, and the State presented Defendant's recorded statement at trial. The jury convicted Defendant of second-degree murder. The district court held an amenability hearing, found Defendant was not amenable to treatment, and sentenced him as an adult. Defendant appeals.

**DISCUSSION**

**I.      The District Court Did Not Err in Admitting Defendant's Recorded Statement to Law Enforcement**

**{4}** Defendant argues that the district court erred in admitting his recorded statement, asserting that law enforcement coerced him into an implied waiver of his statutory right to remain silent. The State contends Defendant validly waived his constitutional rights. As we explain below, we are persuaded that Defendant's waiver was knowingly, intelligently, and voluntarily made.

**{5}** "An appeal of a district court's denial of a motion to suppress inculpatory statements involves mixed questions of fact and law." *State v. Wyatt B.*, 2015-NMCA-110, ¶ 16, 359 P.3d 165. We defer to the district court's factual findings, viewing the evidence in the light most favorable to the district court's ruling, unless the findings are

---

[1]Defendant told law enforcement that it was Victim who grabbed a shovel first and approached Valencia and Defendant when they pulled up to the property. Defendant also alleged that Victim then threw a clump of "dirt" at Valencia prompting Valencia to grab the shovel.

clearly erroneous. *State v. Rivas*, 2017-NMSC-022, ¶ 24, 398 P.3d 299. The question of whether a valid waiver has been made, however, is reviewed de novo. *Id.*

**{6}** Because Defendant was sixteen when he was questioned by law enforcement about Victim's death, he was subject to the Delinquency Act (the Act), NMSA 1978, Section 32A-2-1 to-33 (1993, as amended through 2019). The Act provides that no child "who is alleged or suspected of being a delinquent child shall be interrogated or questioned without first advising the child of the child's constitutional rights and securing a knowing, intelligent and voluntary waiver." Section 32A-2-14(C). Section 32A-2-14(E) provides that in determining whether a child over the age of fifteen knowingly, intelligently, and voluntarily waived his or her rights, the district court shall consider the following factors:

> (1)    the age and education of the [child];
>
> (2)    whether the [child] is in custody;
>
> (3)    the manner in which the [child] was advised of [his or her] rights;
>
> (4)    the length of questioning and circumstances under which the [juvenile defendant] was questioned;
>
> (5)    the condition of the quarters where [the child] was being kept at the time of being questioned;
>
> (6)    the time of day and the treatment of the [child] at the time of being questioned;
>
> (7)    the mental and physical condition of the [child] at the time of being questioned; and
>
> (8)    whether the [child] had the counsel of an attorney, friends or relatives at the time of being questioned.

*Id.*

**{7}** "We examine the totality of the circumstances to determine whether the [d]efendant knowingly, intelligently, and voluntarily waived his constitutional rights giving particular emphasis to the factors listed in the statute." *State v. Lasner*, 2000-NMSC-038, ¶ 7, 129 N.M. 806, 14 P.3d 1282 (internal quotation marks and citation omitted). In determining whether a child has waived their right to remain silent we first determine whether "the relinquishment of the right . . . [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *State v. Gutierrez*, 2011-NMSC-024, ¶ 9, 150 N.M. 232, 258 P.3d 1024 (internal quotation marks and citation omitted). "Second, the waiver must have been made with a

full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). A waiver "need not be reduced to writing and signed by the defendant[.]" *Id.* ¶ 17 (alteration, internal quotation marks, and citation omitted).

**{8}**     We begin by analyzing Defendant's age, education, and mental and physical condition. "[A]lthough Section 32A-2-14 provides greater protections for all children than does *Miranda*, the Legislature treats children fifteen and older as having the intellectual and developmental capacity of adults to waive their constitutional and statutory rights." *State v. DeAngelo M.*, 2015-NMSC-033, ¶ 11, 360 P.3d 1151. Defendant was sixteen years old at the time of questioning and was homeschooled. The record is devoid of any indication that Defendant's educational attainment was somehow deficient or that his age impacted his ability to intelligently waive his right to remain silent. In addition, Defendant does not argue that his mental or physical condition at the time of being questioned prevented him from knowingly and intelligently waiving his rights. Accordingly, these factors support a conclusion that Defendant's waiver was knowing, intelligent, and voluntary.

**{9}**     Next, we consider the conditions surrounding the interrogation. Defendant was not "in custody" at the time of the interrogation; the interrogation was merely an investigatory detention. The condition of the quarters where Defendant was being kept is not at issue because Defendant was in the living room of his home at the time of questioning. Similarly, the length of the interrogation does not weigh in favor of finding that Defendant's waiver was not knowing, intelligent, and voluntary. Our Supreme Court has found that an interview of a child that lasted one hour was "not particularly long[.]" *State v. Martinez*, 1999-NMSC-018, ¶ 22, 127 N.M. 207, 979 P.2d 718. In this case, Defendant was only questioned for approximately thirty-five minutes. In addition, although the questioning in this case occurred at approximately midnight, Defendant does not argue that the late hour of questioning "detract[ed] from [his] voluntariness." *See Lasner*, 2000-NMSC-038, ¶ 12 (holding that even though a child was interrogated at 3:00 a.m., the time of day did not detract from the defendant's ability to voluntarily waive his right to remain silent). The interrogation was brief, occurred in Defendant's home, and the late hour of the interview does not appear to have impacted Defendant's ability to understand his rights. The circumstances of the interrogation support admission of Defendant's statement.

**{10}**     We now consider the manner in which Defendant was advised of his rights. Defendant takes issue with the fact that Defendant's father signed the waiver of rights form, and not Defendant. We note however that a waiver "need not be reduced to writing and signed by the defendant," *Gutierrez*, 2011-NMSC-024, ¶ 17 (alteration, internal quotation marks, and citation omitted), and we are not persuaded that Defendant was confused about his rights or that he "had no choice" but to speak with police after his father signed the waiver as Defendant contends. Detective Chavez, who conducted the questioning of Defendant, referred at times to Defendant and at times to Defendant's father while reading Defendant his rights. After the rights were read to Defendant, Detective Chavez separately and directly asked Defendant if he understood

his rights, and Defendant nodded in assent. Although Defendant never specifically agreed to speak with Detective Chavez and did not sign the waiver of his rights, he began answering Detective Chavez's questions immediately after being advised of his rights and after indicating that he understood them.

**{11}** Our Supreme Court has previously held that similar circumstances weigh in favor of a finding that a child has voluntarily waived their rights. In *Gutierrez*, a law enforcement officer read a child his rights and the child acknowledged that he understood his rights. *Id.* ¶ 10. The child never affirmatively agreed to speak with law enforcement officers, did not orally waive his constitutional rights after being advised of them, nor did he sign a written waiver. *See id.* ¶¶ 10-11. However, the child began answering questions immediately after indicating that he understood his rights. *Id.* ¶ 17. Under these circumstances, our Supreme Court concluded that the child's conduct constituted an implied waiver. *Id.* Similarly, in *Martinez*, our Supreme Court declined to find that a child's statement should have been suppressed where the child answered questions after being advised of his rights, even though police did not obtain an express waiver of rights, either oral or written. 1999-NMSC-018, ¶ 12. As in *Martinez* and *Gutierrez*, Defendant's decision to answer Detective Chavez's questions after signaling that he understood his rights supports the conclusion that Defendant implicitly waived his rights knowingly, intelligently, and voluntarily.

**{12}** Finally, we consider Defendant's argument that Detective Chavez "used the presence of [Defendant's] parents and their cooperation as coercion against [Defendant]." We are not persuaded. Defendant's argument is speculative—he fails to direct our attention to where in the record he established that he was coerced or pressured to waive his rights as a result of his parent's presence. *See State v. Smith*, 2019-NMCA-027, ¶ 17, 458 P.3d 613 (stating "mere assertions and arguments of counsel are not evidence" (internal quotation marks and citation omitted)). Detective Chavez explicitly informed Defendant that he could stop "talking at any time" and at no point did Defendant appear confused, ask to stop, or look to his parents for guidance. Neither of Defendant's parents spoke after Detective Chavez began questioning Defendant, and neither of Defendant's parents told Defendant he had to answer Detective Chavez's questions. As the district court noted, Defendant "held his own" during the interrogation and did not demonstrate a lack of understanding nor did his statements appear to be coerced. *See, e.g.*, *Gutierrez*, 2011-NMSC-024, ¶ 16 (holding that a child's rights were validly waved and emphasizing that "[a]t no point during his interrogation did [the c]hild claim not to understand what was being said or otherwise indicate problems with comprehension"). Because Defendant does not point us to where in the record the presence of his parents or Detective Chavez's discussion with his parents pressured or coerced him to waive his rights, and given our own review of the record, we disagree that there is evidence of coercion.

**{13}** We conclude the district court did not err in finding that Defendant knowingly, intelligently, and voluntarily waived his statutory right to remain silent.

## II. The District Court Did Not Err in Denying Defendant's Proposed Self-Defense and Voluntary Manslaughter Instruction

**{14}** Defendant argues that the district court should have instructed the jury on self-defense and the lesser included offense of voluntary manslaughter. We disagree. Because Defendant proposed the requested jury instructions below, he preserved the issue for appeal, and we review the district court's denial for reversible error. *State v. Montoya*, 2015-NMSC-010, ¶ 25, 345 P.3d 1056. Reversible error occurs when "a reasonable juror would have been confused or misdirected" by the jury instruction. *State v. Parish*, 1994-NMSC-073, ¶ 4, 118 N.M. 39, 878 P.2d 988. "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747 (alteration, internal quotation marks, and citation omitted).

### A. Self-Defense Instruction

**{15}** Defendant claims that Valencia was in fear when he killed Victim, and that the killing was an act of self-defense. "Homicide is justifiable if the killer acted reasonably in self-defense." *State v. Sutphin*, 2007-NMSC-045, ¶ 22, 142 N.M. 191, 164 P.3d 72 (internal quotation marks and citation omitted). Accordingly, a defendant is entitled to a self-defense instruction if the evidence demonstrates that "(1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed." *Swick*, 2012-NMSC-018, ¶ 60 (internal quotation marks and citation omitted).

**{16}** In determining whether Valencia was in fear and whether that fear was reasonable, we focus on the final encounter between Victim and Valencia wherein Valencia approached Victim with a shovel and in response, Victim grabbed a rake and, according to Defendant, threw a clump of dirt or a rock at Valencia. After reviewing the record we are not persuaded that Valencia was in fear of apparent death or great bodily harm. First, Valencia never expressed any fear of Victim. To the contrary, prior to the final encounter between Victim and Valencia, Valencia explicitly expressed a desire to fight Victim. Nor is there any evidence that Victim's actions would have caused Valencia fear. There was no evidence that Victim swung at Valencia with the rake or charged at him. Instead, the evidence presented was that Victim and Valencia were "about 15 feet" apart from each other when the altercation occurred. While we acknowledge that there was evidence that Victim threw a rock or clump of dirt at Valencia, we are unpersuaded that Valencia "was put in fear by an apparent danger of *immediate death or great bodily harm*" by this act. *Id.* (emphases added). Our precedent is clear, "[s]elf-defense requires subjective fear[,]" *State v. Peterson*, 1998-NMCA-049, ¶ 11, 125 N.M. 55, 956 P.2d 854. In the absence of evidence indicating such subjective fear, Defendant is not entitled to a self-defense instruction. *See id.*

**{17}** In addition, we have previously held that a "claim of self-defense may fail if the defendant was the aggressor or instigator of the conflict . . . or if the [d]efendant uses excessive force in response to [a] threat[.]" *State v. Abeyta*, 1995-NMSC-051, ¶ 14, 120 N.M. 233, 901 P.2d 164, *abrogated on other grounds by State v. Campos*, 1996-NMSC-043, ¶ 32 n.4, 122 N.M. 148, 921 P.2d 1266. In *State v. Emmons*, we held that a defendant was not entitled to a self-defense instruction because the defendant was the aggressor and instigator of the conflict, and there was no appearance of immediate danger or death. 2007-NMCA-082, ¶ 12, 141 N.M. 875, 161 P.3d 920. In *Emmons*, the defendant chased down and confronted a pair of repo men at gunpoint who had repossessed his truck from his yard after the repo men had already left the defendant's home, and after he had already lost sight of the repo men. *Id.* ¶¶ 2-3, 9. We concluded that the defendant was not entitled to a self-defense instruction because "it was he who sought them out by pursuing them from his house to the place of their roadside meeting." *Id.* ¶ 9. We held that the defendant's actions were "not defensive, [but] rather, an offensive use of deadly force which is not justified." *Id.* ¶ 13. Similarly, here, it was Valencia who instigated the conflict with Victim when he returned to Victim's location armed with a deadly weapon. We hold that the district court did not err in denying Defendant's proposed self-defense instruction.

## B.    Voluntary Manslaughter Instruction

**{18}** Defendant also asserts that the district court erred in denying his proposed voluntary manslaughter instruction. The district court rejected the proposed instruction after finding that there was insufficient evidence of provocation. We agree that the facts do not demonstrate provocation sufficient to warrant an instruction for voluntary manslaughter.

**{19}** "Failure to instruct the jury on a lesser included offense of a charged offense is reversible error if: (1) the lesser offense is included in the greater, charged offense; (2) there is evidence tending to establish the lesser included offense and that evidence establishes that the lesser offense is the highest degree of crime committed; and (3) the defendant has tendered the appropriate instructions preserving the issue." *State v. Jernigan*, 2006-NMSC-003, ¶ 21, 139 N.M. 1, 127 P.3d 537. We focus our analysis on the second factor, as it is not in dispute that voluntary manslaughter is a lesser included offense of second-degree murder, or that Defendant tendered the appropriate instruction to the district court.

**{20}** Voluntary manslaughter requires a showing that:

1. [D]efendant killed [Victim];

2. [D]efendant knew that his acts created a strong probability of death or great bodily harm to [Victim];

3. [D]efendant acted as a result of sufficient provocation[.]

UJI 14-220. A defendant is only entitled to a voluntary manslaughter jury instruction if there is evidence of sufficient provocation. *State v. Gaitan*, 2001-NMCA-004, ¶ 11, 130 N.M. 103, 18 P.3d 1056. " 'Sufficient provocation' is defined as 'any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions.' " *Jernigan*, 2006-NMSC-003, ¶ 24 (quoting UJI 14-222 (defining sufficient provocation)). The "question of provocation is not solely a subjective one." *State v. Taylor*, 2000-NMCA-072, ¶ 27, 129 N.M. 376, 8 P.3d 863. The "provocation is not sufficient if an ordinary person would have cooled off before acting." *State v. Gaitan*, 2001-NMCA-004, ¶ 11 (internal quotation marks and citation omitted). Finally, "the law does not permit one who intentionally instigates an assault on another to then rely on the victim's reasonable response to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to manslaughter." *Id.* ¶ 13.

**{21}**     We have held that a defendant is not entitled to a manslaughter instruction if the defendant had "sufficient time to cool off" following provocation. *State v. Castro*, 1979-NMCA-023, ¶ 7, 92 N.M. 585, 592 P.2d 185, *overruled on other grounds by Sells v. State*, 1982-NMSC-125, ¶¶ 7-10, 98 N.M. 786, 653 P.2d 162. In *Castro*, the defendant left the victim's residence after having an argument with the victim, purchased a firearm, and over thirty minutes later, returned and killed the victim. *Id.* ¶ 2. We concluded that the defendant had ample time to cool off and that "[s]udden anger or heat of passion and provocation" did not occur. *Id.* ¶ 7. Similarly, here, Defendant had sufficient time to "cool off" between the two encounters described by Defendant in his interview with law enforcement. According to Defendant, during the first encounter, Valencia was not armed with a firearm or weapon. After the first encounter with Victim, Defendant and Valencia went to Valencia's home where Valencia got a firearm and according to Defendant, Valencia said he "was going to make [Victim] fight" him. Defendant and Valencia did not return until twenty minutes later when Valencia approached Victim and eventually shot and killed him. As in *Castro*, we find that there was more than enough time for Valencia to cool off between the two encounters with Victim.

**{22}**     The lack of provocation in this case is further buttressed by the fact that Valencia instigated the altercation during the final encounter with Victim. "[T]he law does not permit one who intentionally instigates an assault on another to then rely on the victim's reasonable response to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to manslaughter." *Gaitan*, 2002-NMSC-007, ¶ 13. By Defendant's own admission, Valencia chose to return to Victim's location intending to fight Victim and retrieved a firearm in preparation. When Valencia and Defendant returned, Defendant stated that Valencia approached Victim with a "shovel" and Victim threw "something" at Valencia. Valencia then returned to Defendant's vehicle, got his firearm, and shot and killed Victim. Even viewing Defendant's version of the facts in the light most favorable to Defendant's proposed voluntary manslaughter instruction, we cannot say that these facts demonstrate sufficient provocation. Accordingly, we conclude that the district court did not err in denying Defendant's request for the jury to be instructed on voluntary manslaughter.

**III.    The District Court Did Not Abuse Its Discretion in Finding That Defendant Was Not Amenable to Treatment**

**{23}**    Lastly, Defendant argues that the district court abused its discretion by finding that Defendant was not amenable to treatment. We review a district court's amenability findings for abuse of discretion, *State v. Nehemiah G.*, 2018-NMCA-034, ¶ 41, 417 P.3d 1175, and will only conclude that a district court abused its discretion if its ruling was "clearly against the logic and effect of the facts and circumstances of the case." *Id.* ¶ 42. In determining whether a child is amenable to treatment, a district court must consider each of the following factors:

>    (1)    the seriousness of the alleged offense;

>    (2)    whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

>    (3)    whether a firearm was used to commit the alleged offense;

>    (4)    whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;

>    (5)    the maturity of the child as determined by consideration of the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability;

>    (6)    the record and previous history of the child;

>    (7)    the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and

>    (8)    any other relevant factor, provided that factor is stated on the record.

Section 32A-2-20(C). "The purpose of these findings is to show that the district court gave proper consideration to the issue of amenability to treatment of rehabilitation." *State v. Sosa*, 1997-NMSC-032, ¶ 9, 123 N.M. 564, 953 P.2d 1017, *abrogated on other grounds by State v. Porter*, 2020-NMSC-020, ¶ 7, 476 P.3d 1201. In this case, the district court addressed and considered each of the statutory factors listed in Section 32A-2-20(C), and ultimately determined that Defendant was not amenable to treatment. We conclude that the district court did not abuse its discretion because its ruling was not "clearly against the logic and effect of the facts and circumstances of the case." *Nehemiah G.*, 2018-NMCA-034, ¶ 42 (internal quotation marks and citation omitted).

**{24}** The evidence supports the district court's finding that the first four factors relating to the nature and seriousness of the offense, "weigh heavily against" Defendant's amenability. The district court found that Defendant participated in "every aspect of conduct" that led to Victim's death except "the actual shooting." Following the disagreement over the alleged payment shortage, Defendant drove Valencia to another residence where Valencia acquired a firearm. Defendant then drove Valencia back to Victim's house, where Valencia shot and killed Victim. As Detective Chavez testified, Defendant "willingly [drove] the murderer over there knowing he put a rifle in the vehicle, there was no threat to him . . . [Defendant] never said, 'I felt fearful for my life and so I had to drive him.' . . . He drove him purposefully over there to commit the crime." In short, Defendant facilitated, enabled, and participated in, a willful and aggressive murder using a firearm.

**{25}** With respect to the fifth factor—consideration of Defendant's maturity— Defendant's argument centers on the testimony of two expert witnesses. Defendant argues that the district court "ignored the experts' conclusions and cherry-picked negative features from the reports to support a contrary conclusion." We are not convinced. "[A] district court conducting an amenability hearing may disregard expert testimony." *Nehemiah G.*, 2018-NMCA-034, ¶ 56. While a district court may not "arbitrarily disregard expert testimony," it may disregard expert testimony if it has "some rational basis for doing so." *Id.* ¶ 57. In addition, a district court may consider a "prediction regarding the child's future conduct." *State v. Doe*, 1983-NMCA-015, ¶ 27, 99 N.M. 460, 659 P.2d 912. At trial, Dr. Susan Cave and Dr. George Davis opined that Defendant was amenable to treatment. Despite their ultimate opinions, however, both experts expressed concerns about Defendant's behavior, particularly his use of drugs, which served as part of the district court's basis for finding Defendant was not amenable to treatment. Dr. Cave testified that in the months leading up to the incident, Defendant routinely used methamphetamine. She further testified that Defendant exhibited key concerns for recidivism, opining that Defendant had bipolar disorder and extreme mood swings. Dr. Cave noted that using methamphetamine "brings out" bipolar disorder, acknowledged that methamphetamine is "not an easy drug to kick" and as such, opined that she was not certain Defendant could refrain from drug use in the future. Likewise, Dr. Davis also testified that Defendant had "a high degree of anxiety" and had required repeated medical treatment due to his drug use. While it was not a foregone conclusion that Defendant would use substances in the future, Dr. Cave and Dr. Davis both felt that Defendant's potential for success was contingent on him maintaining his sobriety. In our view, the district court did not disregard the proffered expert testimony but rather, after considering the experts' testimony, found that Defendant's potential future use of mind-altering substances, particularly given his bipolar diagnosis, weighed against Defendant's amenability to treatment.

**{26}** As to the sixth and seventh factors, while Defendant had no criminal history, the district court considered other evidence in evaluating the Defendant's previous history, public safety, and the likelihood of rehabilitation. First, the district court considered the potential dangers associated with Defendant's drug use discussed above. Second, Defendant admitted to violating his conditions of release by using drugs and failing to

appear for the final day of trial. Third, Defendant escaped from the McKinley County Juvenile Detention Center prior to the amenability hearing. Finally, law enforcement officers testified that Defendant failed to show remorse for his actions, and that he would pose a substantial risk to the community if released. This evidence supports the district court's finding that "the prospects for protection of the public are dim due to [Defendant's] escape and failure to appear at trial[.]"

**{27}** We cannot say that the district court's decision was against the logic and effects of the case. Therefore, we hold that the district court did not abuse its discretion in finding that Defendant was not amenable to treatment.

**{28}   CONCLUSION**

**{29}**   We affirm.

**{30}   IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**